## O'NEIL v. METROPOLITAN ST. RY. CO.

(Supreme Court, Appellate Division, First Department. April 20, 1905.)

CARRIERS—PERSONAL INJURY—BLINDNESS—PROXIMATE CAUSE—EVIDENCE.
    Evidence in an action for personal injury to a passenger *held* sufficient to sustain a finding that the accident was the proximate cause of plaintiff's blindness.

McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Rose M. O'Neil against the Metropolitan Street Railway Company. From a judgment on a verdict for plaintiff, and from an order denying a motion for new trial, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Charles F. Brown, for appellant.
George H. Hart, for respondent.

LAUGHLIN, J. On the evening of the 16th of August, 1899, the plaintiff was a passenger on one of the defendant's southbound cars on 8th avenue, and while she was in the act of alighting at 86th street, according to her testimony, which is corroborated by that of her niece, 10 years of age, who accompanied her, the car, after having stopped to transfer passengers to the 86th Crosstown line, suddenly started, precipitating her to the pavement, inflicting injuries, to recover for which this action was brought.

It is unnecessary to review the evidence relating to the questions of negligence. It has been carefully examined, and we think it was sufficient to take the case to the jury, and that we would not be warranted in setting aside the verdict.

The principal points urged upon the appeal are that the verdict is excessive; that the plaintiff has recovered for total blindness, without sufficient evidence that it was caused by the injuries received at the time of the accident; and that it is contrary to the weight of the evidence on that point. No motion for a nonsuit or for a direction of a verdict was made, but, at the close of the evidence, counsel for the defendant requested the court to take from the jury "the question of the eyesight, on the ground that the evidence does not justify its submission to the jury as the proximate result," and to the denial of this motion he took an exception. No exception was taken to the charge of the learned trial judge, in which the jury were very fully and fairly instructed upon all material points, and only one request to charge was made by the defendant, and this was granted. The verdict was for $13,580.

In setting forth the material facts which the jury might have found and are deemed to have found, it is unnecessary to discuss discrepancies and inconsistencies in the testimony, for it may be assumed that the arguments in that behalf urged here were presented to the jury and resolved in favor of the plaintiff. The questions, therefore, requiring consideration, are (1) whether there was

93 N.Y.S.—10

any competent evidence that the accident was the proximate cause of the loss of the plaintiff's eyesight, justifying the denial of the defendant's motion to exclude that question from the jury; and (2) whether the conclusion reached by the jury on that point, as indicated by the amount of their verdict, is sustained by the evidence; and (3) whether the evidence on the question of damages generally justified the verdict in amount.

The plaintiff was a maiden lady, 61 years of age, and the principal of one of the public schools of the city of New York, and had held the position of principal in the public schools of the city for the period of 44 years. Her salary at the time of the accident was $2,500 per annum. She was in excellent health, and, with the exception of very slight astigmatism for one of her age, for which glasses had been prescribed in the year 1891, which it had not become necessary to change, her eyesight was and always had been perfect. It is evident that she was precipitated to the pavement with considerable violence, and that she landed upon her head and left shoulder, for she sustained a scalp wound an inch and a half in length nearly on top of her head, above her left ear, and her left collar bone was fractured. There is evidence indicating: That she was stunned, and for a brief time remained in a semiunconscious condition, and that her eyesight immediately became blurred, giving her a feeling of bewilderment. That, while she was able to discover light and shadows, and the outlines of people, she was unable to recognize features, and so remained until she had been placed in a cab, taken to her home on East 120th street, and until after a doctor who was summoned arrived, and was setting the collar bone, and it soon thereafter disappeared; and she does not say that it reoccurred again until after the operation on her eye in 1900. That immediately after the accident she had such intense pain in her eye and in her head between the wound and the eye that she did not feel the injury to the collar bone. That she continued to have these pains almost constantly until shortly before the trial, and then had them at intervals of two or three weeks. That these pains were persistent, and were not like an ordinary headache, and she had never had them before the accident. That "since the accident the pain starts in the spot where I struck, and it feels as if there was a piece of elastic tied to each of my eyes, pulling the eyes apart, and then the pain goes over my neck here, and it feels as if something had gone off the head, and it was flying in different directions. I could not describe you the pain. I had never had anything like that before this accident." That the pain in her head was more intense than the pain in her eye the night of the accident, and that the pain in the eye was not intense that night. That she was not sure about the time the pain commenced in the eye, but thought that it was the next day, and that the night of the accident "the pain in the head was intense, and my whole head was aching and paining. I thought the whole part of my head gone. * * * I had pain in my eye all along, but not the intense pain, agonizing pain, I afterwards had." The plaintiff testified that she complained of the pain in her eye to the physician who was called to dress her

wounds, but he testified he had no recollection on the subject. He testified that there was one scalp wound an inch long, which did not require stitches, and healed in about eight days. She testified that there were two scalp wounds, and that they both left scars and depressions. The fracture of the collar bone united and healed in about three weeks. The plaintiff was able to resume her duties as principal of the school that fall, and, according to her testimony, had no further serious trouble with her vision or her eye until the month of October, 1900, when, one day, as she was crossing a park, and a fire engine was passing, she felt a sensation as if dust was in her eye. This was on Friday noon, and on returning to school she had one of the teachers examine the eye, but nothing was found. She went to Dr. O'Connell, an eye specialist, the following Monday night. After he had examined the eye several times during a period of two or three weeks, on November 1st he took her to Dr. Hepburn, another specialist, who, after an examination, operated on the eye for glaucoma, and during the operation discovered a subluxation of the lens, which in his opinion, was sufficient to account for the glaucoma, and, in his opinion, caused it. It appeared from the testimony of an experienced optician, who was neither an oculist nor a physician, and who had first examined the plaintiff's eyes in 1891, and found them normally better by 10 years than is ordinarily found in persons of her age, that ordinarily after a person arrives at the age of 40 years accommodation becomes lessened to such an extent that glasses are required, and that this astigmatism increases so that ordinarily a change of glasses is required every two years thereafter; that, although the plaintiff was 53 years of age when he first examined her eyes, she scarcely needed glasses then; that he examined the plaintiff's eyes periodically thereafter, and always found the eyesight perfect, and but slight astigmatism; that in 1896 he found the right eye had failed one point, and the left three points, as to acuteness of vision in the distance, but this he attributed to exhaustion of energy incident to her work, as it was at the close of the school year; that the sight had not failed, but only the ability to accommodate; that in 1898 he found the right eye one point and the left one and a half points off normal, which was still decidedly better than the average person of her age; that in September, 1900, after the accident, he found the right eye normal, and the left two points off normal showing. He says, that their ability to accommodate (that is, the adjustability of the lens) had "decidedly improved," which was a very uncommon thing for one of her age, but it would seem, judging by the points, that the right had improved, but the left had lost half a point in its adjustability. Drs. Hepburn and O'Connell, each of whom was a well-known eye specialist of extensive experience, were witnesses for the plaintiff. They were given the history of the case, including the condition of the plaintiff's eyesight as disclosed by the examination of the optician more than a year after the accident, and they testified that the blow on the head at the time of the accident was sufficient to account for the subluxation of the lens and for the glaucoma, which is a hardening of the ball of the

eye, caused by an interference with the circulation of the eye, which causes diminished vision.

The plaintiff admitted that she had prior to the accident four slight attacks of rheumatism, without fever, which did not disable her from performing her school work; and there is evidence indicating that she had rheumatic symptoms or tendencies, and that she had prior to the operation experienced some difficulty or stiffness with one of her hands, and with both thereafter, and she had some deformity or enlargement of the joints of the wrist and of the fingers, which the medical evidence indicates was due to rheumatism. There is also evidence indicating that she had slight hardening of the arteries, incident to age, known as "arteriosclerosis," but not to the extent usually found in persons of her age. Opinions were given by experts, of experience and standing, summoned by the defendant, that people of the plaintiff's age often have glaucoma, caused by the hardening of the arteries, and that it may be caused by rheumatism, and that, in their opinion, while a subluxation of the lens might have been caused by a blow on the head, it would require a more severe blow than is indicated by the testimony in this case, and that, if the subluxation was caused by the injury, the difficulty originally experienced with the vision would have continued more or less; that the sight itself would have been affected to some extent and materially before it did in this case; and that the condition of the eye would have been discoverable, and would have ultimately resulted in the formation of a cataract. On the other hand, Drs. O'Connell and Hepburn, with full knowledge of the history of the case, adhered firmly to the opinion that the blow upon the head was a sufficient cause to produce the subluxation and glaucoma, and that neither would have been necessarily discoverable by an examination in the meantime; and Dr. Hepburn is positive in his opinion that neither rheumatic tendencies, nor the hardening of the arteries incident to advanced age, would have caused the subluxation which he discovered; and he further testified that the reason that he concluded that the blow on the head "had something to do with the glaucoma," and finally the loss of sight of both eyes, was because he found the subluxation, which could not have been caused by the glaucoma, and because he found "a few tags of adhesion between the lens capsule and the iris, immediately in front of it, which were not new. * * * These adhesions were caused by a very low grade of inflammatory action—probably caused by the original injury." And he also gives it as his opinion that the rheumatism, to the extent that the plaintiff had it, would not result in glaucoma. The competency and integrity of Dr. Hepburn are not questioned. His testimony is clear and positive that he found this subluxation of the lens, and indications that it was of long standing. The jury were justified in believing this testimony. The experts called by the defendant were unable to account for the subluxation of the lens, except on the suggestion that it might have been caused by slip of the surgeon's knife in performing the operation for glaucoma; and yet all conceded Dr. Hepburn's skillfulness, and none admitted

that he himself had ever caused a subluxation by an operation, and their only basis for the suggestion was an intimation by text-writers that it might thus be caused. With that fact—the existence of the subluxation—established in the case, most of the expert testimony introduced by the defendant is of little value. We are of opinion that the testimony of the plaintiff, showing a continuity of pain in this eye since the accident, supported and sustained by the medical testimony introduced in her behalf, fairly sustains the finding of the jury that the glaucoma of the left eye resulted from the injuries she received through the negligence of the defendant. It is undisputed that the glaucoma in the left eye destroyed the sight of that eye and communicated to the right eye, ultimately resulting in permanent total blindness. The defendant being responsible for the plaintiff's total blindness, it needs no argument to show that the verdict is not excessive.

It follows, therefore, that the judgment and order should be affirmed, with costs. All concur, except McLAUGHLIN, J., who dissents.